Wilson *v.* Cobb.

HANNAH M. WILSON, executrix of Daniel M. Wilson,
appellant,

and

MARY ANN COBB and others, executors of George T. Cobb,
respondents.

C., W. and B. were partners in the iron business, and, in payment
for railroad iron, took bonds of the R. & W. R. R. Co. The firm dis-
solved, and these bonds were divided between the partners. Litiga-
tion ensued relative to these bonds, and C. and W. were advised by
their counsel to purchase an additional number of the same class of
bonds, so as to control the market. C. purchased twenty-two bonds
with his own money. Afterwards an arrangement was made by all
the holders of these bonds to place them in the hands of a single per-
son for sale, and a paper was drawn by which C. was made trustee for
such purpose. In signing such paper, W. put his name under that of
C., opposite these twenty-two bonds, indicating a part ownership
therein. In signing this paper, as also in a subsequent paper, C. placed
the bonds received by him at the dissolution of the firm, separate
from these twenty-two bonds. C. sold all the bonds, and failed to
account to W. for the one-half of the profits on the twenty-two bonds.
*Held,* that he must account for such profits, with interest.

On appeal from a decree advised by the vice-chancellor.
His opinion is reported in *Wilson* v. *Cobb*, 1 *Stew.* 177.

*Mr. A. Q. Keasbey,* for appellant.

*Mr. T. N. McCarter,* for respondents.

REED, J.

George T. Cobb, in his life-time, was a partner of Daniel
M. Wilson and William D. Bruen. The firm was engaged
in the iron business, in the city of New York, until its dis-
solution in 1852. During its existence, the firm received in
payment for railroad iron certain first mortgage bonds of
the Rutland and Washington Railroad Company. After-

Wilson v. Cobb.

ward the railroad company became embarrassed, and litigation ensued in respect to the bonds, by which they became greatly depreciated.    At the dissolution of the firm, the bonds were divided between the partners, Cobb, Wilson and Bruen.    Thereafter, as the litigation approached its conclusion, Cobb and Wilson were advised by their counsel that, in order to protect their interests, it would be advisable for them, in case the litigation terminated favorably, to own or control a majority of that kind of bonds.    Afterward Cobb, for this purpose, purchased twenty-two additional bonds. Whether these bonds were purchased on the joint account of Cobb and Wilson or the purchase was a separate transaction of Cobb, is the important question involved in this cause.

It appears that, after this purchase, an agreement was entered into by all the holders of these bonds, by which they should be placed for sale in the hands of a single person.    The object was to control the market and obtain a more advantageous bargain.    The following is a copy:

" We, the subscribers, owners of the number of bonds set. opposite our respective names, of the Rutland and Washington Railroad Company, secured by a first mortgage of said company, do hereby agree to place said bonds in the hands of George T. Cobb, as trustee, to hold the same for our joint interest in proportion to the number of our bonds respectively.    And we do hereby relinquish our individual right to sell or dispose of the same, or any part thereof, without the sanction and consent of said George T. Cobb.    And we do authorize the said George T. Cobb to dispose of and sell said bonds at such rate and for such sum as he may deem best for our joint interest, dividing the proceeds received in proportion to the bonds owned by us respectively.

" In witness whereof we have hereunto set our hands and seals this twelfth day February, 1864.

|  |  |
|---|---|
| George T. Cobb [seal], | 29 |
| D. M. Wilson [seal], | 43 |
| Sarah Bruen [seal], | 16 |
| D. A. Hayes<br>G. H. Bruen } [seal], | 20 |
| G. T. Cobb<br>D. M. Wilson } [seal], | 22 |
|  | 130" |

Wilson *v.* Cobb.

Acting under this trust, Mr. Cobb sold these bonds, among them the twenty-two in controversy. The proceeds from these twenty-two Mr. Cobb retained. Wilson claimed, by the bill filed in this cause, that Cobb should account to him for one-half of the profits of such sale. Had Wilson then, and his representatives now, an equitable right in this fund, arising out of an original arrangement between Cobb and Wilson previous to the purchase of the bonds?

Wilson's bill is based upon an alleged understanding that these bonds should be purchased on joint account of himself and Cobb. Mr. Cobb's defence is that he bought them on his own account. The testimony of neither Cobb nor Wilson is in the case. Both died before their testimony was taken or completed. The bill of Wilson, the answer of Cobb, the testimony of Stoughton, the lawyer who advised the purchase of the bonds, and the arguments subsequent to such purchase, are before us, and, from all, I think the conclusion must be drawn that these bonds were purchased as a joint transaction.

Mr. Cobb, in his answer, admits that he was advised by counsel that, in order to protect the interest of himself and Wilson, it would be advisable for them to purchase additional bonds. He says that when he proposed to Wilson to go into the market and buy thirty-seven bonds, he understood that Wilson declined to do so, and then he purchased these twenty-two bonds on his own account and for his own use. That Wilson made such refusal, and that the bonds were subsequently understood to be Cobb's alone, seems inconsistent with the subsequent history of the parties' acts relative thereto.

It appears that the prosecution of the litigation concerning the original bonds held by the firm was in the hands of Cobb and Wilson. The pleadings show this. It appears that the necessity for the purchase of additional bonds was urged upon both. Mr. Stoughton, the lawyer who was conducting the litigation, says: "I often had interviews with Mr. Wilson and Mr. Cobb during the litigation. Mr. Wil-

son held most of the bonds. I advised Cobb and Wilson to go into the market and purchase enough of the bonds so that they should hold a majority with what they already held or represented. They were together when I gave them this advice. I know that afterward both Cobb and Wilson told me that twenty or twenty-one bonds had been procured in addition to what they already owned."

In accordance with this advice of Stoughton, the twenty-two bonds were purchased in January, 1864. On the 12th of February following, the agreement of that date was drawn by which all these bonds were placed in Cobb's hands for sale. In the agreement of February 12th, it appears that Wilson signed his name under that of Cobb's, both being opposite to the twenty-two bonds and joined by a scroll. As to what took place at the time of signing this agreement the witnesses who were present differ. Sarah Bruen says, that when Wilson signed the second time Cobb said, "Why do you do that?" and that Wilson replied, "That is all right." George H. Bruen says, that when Wilson signed, after Mr. Cobb, Cobb asked him why he had done so, and that Wilson answered, "Because he had a right to do so," and then Cobb replied, "You have not, sir." Mr. Guild, who took an active part in the negotiation, says that there was some talk about the number of the bonds, but that there was no remark or question by Cobb or by any one as to the act of Wilson's signing the paper. He says that it was all as pleasant as possible. All this testimony was taken from seven to nine years after the transaction.

It is certainly a striking fact that Mr. Cobb, even if he did use the words stated by the Bruens, should have accepted at all the trust under a paper so signed. But the inexplicable feature of the signing is, that Mr. Cobb, after signing for twenty-nine bonds, should have signed separately for these twenty-two bonds, if his title to both was identical. All the bonds were first mortgage bonds. No difference in kind or amount appears. There is nothing in the answer

Wilson *v.* Cobb.

of Cobb to explain why these bonds were not placed together instead of apart. The only solution is in the position of Wilson, that Mr. Cobb held the two sets by different titles, and that his interest in the twenty-nine was an entirety, and in the twenty-two a moiety. This separation appears not only in the paper of February 12th, but also in a subsequent paper.

The following is a copy:

"New York, March 17th, '64.

"We, the undersigned, holders of the bonds secured by a first mortgage of $250,000 on the Rutland and Washington Railroad Company, executed by said company to you and to Shepherd Knapp, hereby request that you resign your place and stead as such trustee, in favor of such person as may be nominated to the Court, by a majority in interest of said bondholders.

G. T. Cobb, twenty-nine bonds.
G. T. Cobb, twenty-two bonds."

Nothing appears concerning this paper except that it is in the handwriting of Mr. Cobb. On the original there is a scroll between the word "Cobb" and the word "twenty-two," drawn by whom does not appear. There appears, therefore, a separation of these two sets of bonds in two instances by Mr. Cobb. From this repeated act, from the fact that both Cobb and Wilson were advised to make a purchase of bonds, and that both Cobb and Wilson informed Stoughton of the purchase, from the fact that Cobb accepted and acted under a trust to sell under a paper in which Wilson had asserted his interest, I am led to the conclusion that the twenty-two bonds were purchased on the joint account of Cobb and Wilson, and that Cobb should account for one-half the profits resulting from their sale, together with interest. He paid for them $7,194. He received $30,800. The difference is $23,606. Wilson's one-half is $11,803. This sum the respondents should account for, with interest upon the same from June 21st, 1864, in addition to the sum of $903 already decreed to be paid to appellant. From this there should be deducted, however,

the amount of interest accruing upon $3,597, (the one-half of the consideration paid for said bonds,) from January 1st to June 21st, 1864.

The decree should be reversed and a decree in conformity with this result made.

Decree unanimously reversed.